# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

DATTO, INC.,
    *Plaintiff*,

v.

WILLIAM FALK,
    *Defendant*.

No. 3:16-cv-00889 (JAM)

## RULING ON CROSS MOTIONS FOR SUMMARY JUDGMENT

A "non-compete" agreement is an agreement between an employer and an employee that an employee will not work for a competing business if she stops working for her employer. Non-compete agreements have proved controversial for hundreds of years since their origin in mercantile England. *See* Harlan M. Blake, *Employee Agreements Not to Compete*, 73 Harv. L. Rev. 625, 629-46 (1960). They continue nonetheless to thrive in the American workplace today and remain a frequent subject for litigation in U.S. courts. *See generally* J. Gregory Grisham, *Beyond the Red-Blue Divide: An Overview of Current Trends in State Non-Compete Law,* 18 Federalist Soc'y Rev. 82 (2017); Norman D. Bishara, *Fifty Ways to Leave Your Employer: Relative Enforcement of Covenants Not to Compete, Trends, and Implications for Employee Mobility Policy*, 13 U. Pa. J. Bus. L. 751 (2011).

A non-compete agreement outright bars an employee from going to work for the competition. Sometimes employers use a less restrictive alternative: to allow an employee to jump ship to the competition but discourage this by docking them with a loss of certain company benefits. "Federal cases draw a distinction between provisions that prevent an employee from working for a competitor and those that call for a forfeiture of certain benefits should he do so." *Tatom v. Ameritech Corp.*, 305 F.3d 737, 744 (7th Cir. 2002). This latter form of agreement is commonly known as a forfeiture-for-competition agreement. *See, e.g.*, *Lucente v. Int'l Bus.*

1

*Machines Corp.*, 75 F. Supp. 2d 169, 172-73 (S.D.N.Y. 1999).

That is the type of agreement at issue in this case. Plaintiff Datto, Inc. seeks to forfeit the stock option rights of defendant William Falk as a consequence of his leaving Datto to work for one of Datto's competitors. Now the parties have cross-moved for summary judgment, and I conclude that Falk agreed to forfeit his stock options and that his agreement to do so is enforceable as a matter of law.

**BACKGROUND**

Datto is a privately-held company based in Connecticut that furnishes data protection and back-up services for businesses. Falk began working for Datto as its Chief Revenue Officer in February 2014. Datto and Falk entered into a series of agreements over the course of his employment that are all necessary to an understanding of this case.

At the start of his employment, Falk signed a document titled "Confidentiality, Assignment of Inventions, and Non-Compete Agreement" that the parties refer to as the "Restrictive Covenant Agreement." Doc. #45-1. This agreement was designed in part to impede Falk from harming Datto if he left his job there. It barred Falk from working for a competitor for one year after the termination of his employment, from soliciting any Datto employees for two years after the termination of his employment, and from thereafter disclosing or using Datto's confidential information. *Id.* at 2-4.

Datto offered Falk stock options as part of his employment package. Doc. #75 at 3. These options were governed by a separate agreement titled "Datto, Inc. 2013 Stock Incentive Plan," which the parties refer to simply as "the Plan." *Id*. at 16-40. The declared purpose of the Plan was to aid Datto in recruiting and retaining employees as well as to benefit the company from the added interest that employees will have in the welfare of the company as a result of having a proprietary interest in the company. *Id.* at 16.

Most importantly for purposes of this litigation, the Plan stated that any stock award "shall immediately terminate" and any stock options "shall no longer be exercisable" if a participant engages in a "Detrimental Activity." *Id.* at 33. The Plan defined "Detrimental Activity" in relevant part to include a participant's working for a business competitor. *Id.* at 18.

In July of 2014, Falk executed a "Notice of Stock Option Grant" agreement providing Falk with the stock options as promised in Datto's employment offer. *Id.* at 11-14. The Grant set the price and vesting schedule for the exercise of stock options. It made clear that it was "subject to the terms and conditions of the Plan, this Notice of Grant, and the attached Stock Option Agreement." *Id.* at 11. The Grant also stated that the "Option shall terminate and shall no longer be exercisable on the date on which the Participant engages in a Detrimental Activity." *Id.* at 13.

For reasons not clear on this record Falk's employment with Datto did not work out as the parties had hoped. And so they negotiated a "Separation Agreement" for Falk to leave. *Id.* at 50-66. Under the terms of this agreement, Falk was in a limbo status of "transition leave" from January 2015 to September 30, 2015, during which time he continued to receive his salary but with few job duties for him to do. *Id.* at 51-52.

The Separation Agreement relieved Falk from the Restrictive Covenant Agreement to the extent that it had barred him from working for a competitor after he left the company's employ at the end of September 2015. *Id.* at 53. Indeed, the agreement "encouraged" Falk to pursue employment "with any other potential employer" during the transition as long as the employment began no earlier than October 1, 2015. *Id.* at 51.

The Separation Agreement also addressed the issue of Falk's stock options. It provided that subject to board approval, the parties would execute an amended agreement that significantly reduced the number of shares for which he would have options. *Id.* at 52, 64-65.

3

The Separation Agreement otherwise provided that Falk's prior agreements with Datto would remain in effect to the extent not modified by the Separation Agreement: "this Agreement does not supersede the Restrictive Covenant Agreement (as conditionally amended herein), Notice of Stock Option Grant, and the Plan, all of which are referenced herein and shall continue to be in full force and effect in accordance with their terms (except to the extent as may be amended herein)." *Id.* at 58.

Falk signed the Separation Agreement on March 16, 2015. *Id.* at 61. Nearly three months later, the parties executed on June 11, 2015, an "Amendment to Notice of Stock Option Grant and Stock Option Agreement" as contemplated by the Separation Agreement. *Id.* at 68-70. This new agreement—which the parties refer to simply as "the Amendment"—specified the reduced number of stock options for Falk and a new vesting and exercise schedule. *Id.* at 68-69.

Importantly, the Amendment also included the following clause describing the status of the Amendment in relation to the parties' prior stock option agreements:

> <u>No Further Modifications or Amendment</u>. Except as amended hereby, the Original Grant Notice and the Original Option Agreement each shall remain in full force and effect and the parties agree that no other modification or amendment exists or is valid or enforceable. For the avoidance of doubt, to the extent there is any conflict between this Amendment and the Original Grant Notice, the Original Option Agreement or the Plan, this Amendment shall control.

*Id.* at 69.

Nearly six months after his employment with Datto ended, Falk accepted a position with Infrascale in February 2016. The parties do not dispute that Infrascale is one of Datto's competitors. Datto sent Falk a letter reminding him of his continuing obligations under the Restrictive Covenant Agreement, including with respect to his duties not to disclose or use confidential information or to solicit Datto employees. Doc #45-2 at 2-4.

4

Datto initially filed this lawsuit after Falk allegedly engaged in conduct in May 2016 that Datto believed to violate the confidentiality and solicitation provisions of the Restrictive Covenant Agreement. *See* Doc. #1. Datto later amended its complaint to allege that Falk's stock options were now void because of his employment with a competitor that amounted to "Detrimental Activity" in accord with the parties' agreements. Doc. #45.

Falk in turn has filed two counterclaims against Datto. Doc. #69. Counterclaim One alleges that Datto breached its contract with Falk by refusing to allow Falk to exercise his stock options in violation of the Separation Agreement. Counterclaim Two is a request for declaratory judgment that the Separation Agreement modified the Grant and the Plan, such that the "Detrimental Activity" provision of the Plan does not apply to negate Falk's right to exercise his stock options.

The parties have now filed cross-motions for partial summary judgment. In essence, these motions ask me to decide as a matter of law if Falk validly agreed to forfeit his rights to Datto stock options as a consequence of his choice to work for one of Datto's competitors.

### DISCUSSION

The principles governing the Court's review of a motion for summary judgment are well established. Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). I must view the facts in the light most favorable to the party who opposes the motion for summary judgment and then decide if those facts would be enough—if eventually proved at trial—to allow a reasonable jury to decide the case in favor of the opposing party. My role at summary judgment is not to judge the credibility of witnesses or to resolve close contested issues but solely to decide if there are enough facts that remain in dispute to

warrant a trial. *See generally Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (*per curiam*); *Pollard v. New York Methodist Hosp.*, 861 F.3d 374, 378 (2d Cir. 2017).

In order to resolve the parties' cross-motions, I need to consider three issues in turn. First, I must decide which state's law applies. Second, I must interpret the meaning of the parties' agreements—to parse them to decide if Falk actually agreed to forfeit his stock options. Lastly, in the event that I conclude that Falk did agree to such forfeiture, I must decide if his agreement is permissible under the law that limits an employer's right to impose non-competition restrictions on employees.

### *Choice of Law*

As an initial matter, the parties dispute the proper substantive law to apply to their dispute concerning Falk's right to any stock options. Falk argues that California law should apply, because he is a resident of California and negotiated the agreements at issue while there. I can see why Falk wants California law to apply, because the law of California is notoriously adverse to the enforcement of non-compete agreements. *See, e.g.*, *Stryker Sales Corp. v. Zimmer Biomet, Inc.*, 231 F. Supp. 3d 606, 620-21 (E.D. Cal. 2017). By contrast, Datto argues that Delaware law applies, in view that the parties expressly agreed to Delaware law in the Plan, the Stock Option Agreement, and the Amendment. Doc. #75 at 40, 46, 69.

I agree with Datto that Delaware law applies. Insofar as the parties' dispute is about stock options, the Amendment supersedes the Separation Agreement (which specified the application of Connecticut law), both in time and in specificity of subject matter. It is clear to me as a matter of basic contract interpretation that the parties unambiguously chose Delaware law to apply to any dispute about Falk's rights to stock options.

Is the parties' choice of Delaware law enforceable? To answer that question, a federal court sitting in diversity must look to the choice-of-law rules of the forum state. *See Int'l Bus.*

6

*Machines Corp. v. Liberty Mut. Ins. Co.*, 363 F.3d 137, 143 (2d Cir. 2004). Under the law of Connecticut, a choice-of-law provision is enforceable "so long as it bears a reasonable relationship to the dispute and was not procured by misrepresentation." *Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 276 n.2 (2d Cir. 2013) (citing *Elgar v. Elgar*, 238 Conn. 839, 850–53 (1996)).

Applying this standard, I conclude that the parties' choice of Delaware law is enforceable. Delaware law has a reasonable relationship to the parties' dispute, because the dispute concerns a stock ownership interest in the shares of a company that is incorporated under Delaware law. And there is no genuine argument that Falk's agreement to the Amendment was procured by any misrepresentation. I will therefore apply Delaware law to this aspect of the parties' dispute concerning Falk's right to Datto stock options.

### *Applicability of "Detrimental Activity" Limit*

The next issue is whether the parties' agreements require Falk to forfeit his stock options because of his decision to work for one of Datto's competitors. As an initial matter, Falk does not contest that his work for a competitor is within the scope of the "Detrimental Activity" clause of the Plan. Instead, Falk argues that the "Detrimental Activity" restriction did not survive the parties' later Separation Agreement and the Amendment.

Falk points to the fact that the Separation Agreement relieved him altogether from the non-compete restriction of the Restrictive Covenant Agreement, and it "encouraged" Falk to pursue employment "with *any* other potential employer." Doc. #75 at 51 (emphasis added). He argues that he relied on this assurance that he could work for any other employer and should not now lose his stock options as a consequence.

But what Falk overlooks is that neither the Separation Agreement nor Amendment did anything to extinguish the separate "Detrimental Activity" limitation as set forth in the Plan and

7

the Grant and its application to Falk's decision to work for a competitor. To the contrary, the Separation Agreement provided that it did *not* supersede the parties' prior agreements including the Plan and the Grant which included the "Detrimental Activity" limitation. Doc. #75 at 58. And the Amendment provided that the parties' earlier agreements—including the Grant— "remain in full force and effect." *Id.* at 69.

Could Datto have done more to warn Falk when the parties negotiated the Separation Agreement and the Amendment that he would lose his stock option rights if he decided to work for a Datto competitor? No doubt so. But my role is to enforce what the parties agreed to. And the short of it is that the parties' later agreements did nothing to supersede or negate the applicability of the Detrimental Activity clause from earlier agreements.

Nor does it defy common sense that the parties would agree to lift the non-compete restriction while continuing the forfeiture-for-competition restriction. It is one thing for a company to relieve an employee from a non-compete agreement after his employment ends (as Datto did for Falk here). But it is quite another thing for a company to agree that a former employee who may choose to work for the competition should also retain his insider rights to private company ownership through stock options. Accordingly, I construe the parties' agreements to provide for the forfeiture of Falk's stock options upon his decision to work for one of Datto's competitors.

### *Validity of the "Detrimental Activity" Limit*

All this brings me last of all to the issue of whether—apart from what the parties have actually agreed—the forfeiture-for-competition provision is enforceable as a matter of law. Under Delaware law, a traditional non-compete provision is subject to a general reasonableness test. *See Kan-Di-ki, LLC v. Suer*, 2015 WL 4503210, at *19 (Del. Ch. 2015). Although Delaware courts have not taken a position whether the same reasonableness test applies to a forfeiture-for-

competition agreement, the Third Circuit has concluded that "[b]ecause of the similarity between the enforceability of a forfeiture-for-competition provision in a management incentive compensation plan and a covenant not to compete in an employment contract we believe that the Delaware courts would apply the same test of reasonableness in both contexts." *Pollard v. Autotote, Ltd.*, 852 F.2d 67, 72 (3d Cir. 1988); *see also Gaver v. Schneider's O.K. Tire Co.*, 289 Neb. 491, 500-01 (2014) (citing cases to same effect); *Deming v. Nationwide Mut. Ins. Co.*, 279 Conn. 745, 769 (2006) ("When pruned to their quintessence, [standard non-compete agreements and forfeiture-for-competition agreements] tend to accomplish the same results and should be treated accordingly.").

Under Delaware law, a restrictive covenant is reasonable and hence enforceable if "(1) it meets general contract law requirements, (2) is reasonable in scope and duration, (3) advances a legitimate economic interest of the party enforcing the covenant, and (4) survives a balance of the equities." *Kan-Di-Ki, LLC*, 2015 WL 4503210, at *19; *see also Pollard*, 852 F.2d at 72 (stating similar factors). Applying these four factors, I conclude that the forfeiture-for-competition agreement at issue here satisfies the reasonableness test.

As to the first of the four factors (whether the agreement "meets general contract law requirements"), there is no dispute that Falk received significant consideration for his entry into the multiple agreements at issue in this case. He was a very highly paid employee and highly paid still after he began on transitional leave. Moreover, Falk was represented by counsel when he entered into the Separation Agreement, and there is no evidence to support Falk's suggestion that he was not or should not have been aware of the Detrimental Activity restriction.

As to the second factor (whether the forfeiture is "reasonable in scope and duration"), Falk points out that the Amendment allowed Datto to exercise his stock options within ten years, and he argues that this ten-year time frame is excessive. But, as Datto notes, under the original

9

Plan, Falk would have had to exercise his stock options at the time he left the company or within 30 days thereafter. *See* Doc. #75 at 26. The ten-year time frame was a benefit negotiated between the parties to allow Falk yet a longer period to exercise his stock options. Accordingly, the fact that Falk was able to negotiate the added benefit of having ten years to exercise his stock options cannot serve to show that the detrimental activity limit was of unreasonable duration.

As to geographical scope of the burden on competition, Delaware courts evaluate the reasonable of territorial scope by determining whether it "reasonably serves the legitimate economic interests" of the party imposing the restriction. *See Delaware Exp. Shuttle, Inc. v. Older*, 2002 WL 31458243, at *11 (Del. Ch. 2002). So in the classic non-compete context, it is unreasonable if a company imposes a worldwide bar to block an employee from working for a competitor who is far away and in no genuine position to carve into the company's home business. *See id.* at *13. Although it is true that there is no geographical limitation to the forfeiture provision here, a geographical limitation would make almost no sense in the context of the Internet-cloud-based product that Datto and competitors sell: electronic data protection and back-up. This industry does not depend in the least on where employees work, customers reside, or business offices are located. Accordingly, I give minimal weight to the fact that the forfeiture provision applies here regardless of conventional geographic boundaries. This is not a case of an employee who is barred altogether from working for the competition anywhere in the world.

As to the third factor, Dattto's legitimate interests are preserved by enforcement of the forfeiture-for-competition agreement. "Stock options, in contrast to other types of regular and bonus compensation, give an employee the right to acquire an ownership interest in a company; that interest in turn gives the employee a long-term stake in the company and supplies him an incentive to contribute to the company's performance." *Tatom,* 305 F.3d at 745. Accordingly, a contractual provision "calling for the forfeiture of such options in the event that the holder goes

10

to work for a competitor thus serves to keep the option holder's interests aligned with the company's." *Ibid.* The forfeiture-for-competition provision reasonably allows Datto to prevent "former employees whose interests become adverse to the company from maintaining an ownership interest." James V. Garvey & Frederic T. Knape, *Employee Stock Forfeiture Provisions - A Different Breed of Restrictive Covenant*, 94 Ill. B.J. 376, 377 (2006).

Datto also has a legitimate economic interest in protecting confidential company information from a potentially subversive shareholder. Under Delaware law, a shareholder has the right to access company information and "to inspect and to make copies and extracts from . . . the corporation's stock ledger, a list of its stockholders, and its other books and records." See 8 Del. C. § 220. Delaware courts have construed "books and records" to include a wide variety of corporate materials. *See Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 788-99 (Del. Ch. 2016). Although Delaware law may not provide unlimited access for shareholders to private company information, Datto has an obvious interest in ensuring that Falk—as an employee of its competitor—is not privy to Datto's sensitive internal documents.

Finally, on the balance of equities, I conclude that the equities favor enforcement of the forfeiture-for-competition agreement. Had Falk simply been terminated in January of 2015, he would not have had any vested stock options to exercise. Following extensive negotiations in which both sides were represented by counsel, Falk obtained the quite lucrative benefits of the Separation Agreement and a reduced number of stock options that would be exercisable over a ten-year period. Datto quite reasonably relies on the forfeiture-for-competition agreement to foreclose Falk's stock option rights as a consequence of his choice to work for the competition.

To summarize, I conclude that the parties' stock options dispute is governed by Delaware law, that the parties agreed to a forfeiture-for-competition agreement with respect to Falk's stock options, and that the forfeiture-for-competition agreement is reasonable and therefore

enforceable as a matter of law. Accordingly, I will grant Datto's motion for summary judgment and deny Falk's cross-motion for summary judgment.

## CONCLUSION

Datto's motion for summary judgment (Doc. #73) as to Count Two and as to Counterclaims One and Two is GRANTED. Falk's cross-motion for summary judgment (Doc. #91) as to Counts One and Two and as to Counterclaims One and Two is DENIED. In addition, Falk's motion for an order to show cause to reopen discovery and briefing (Doc. #114) is DENIED for substantially the reasons set forth in Datto's response (Doc. #117). This ruling is without respect to Datto's remaining breach-of-contract claim in Count One regarding Falk's alleged solicitation of Datto employees and use of confidential information.

It is so ordered.

Dated at New Haven this 13th day of March 2018.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge